IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

| | | |
|---|---|---|
| JAMIE KENNEDY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | |
| | ) | CIVIL CASE NO.   **CV421-cv-333** |
| LLOYD J. AUSTIN III, | ) | |
| in his official capacity as Secretary | ) | |
| of the Department of Defense, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

## COMPLAINT

COMES NOW the Plaintiff, JAMIE KENNEDY, and files this Complaint against Defendant, LLOYD J. AUSTIN III, Secretary of Defense, in his official capacity as Secretary of the Department of Defense, alleging that the Defendant acted in violation of Title VII of the Civil Rights Act of 1964, as amended, when an Agency under his authority subjected Plaintiff to various racially discriminatory employment actions and harassment, showing as follows:

## INTRODUCTION

1. This civil rights action seeks pecuniary and non-pecuniary compensatory damages from the Defendant as a result of racially discriminatory employment actions taken against the Plaintiff, including subjecting her to a hostile work environment due to her race, imposition of a "No Contact" order against the Plaintiff, placing Plaintiff on an alternate shift, and proposing a seven (7) day suspension based on a false accusation of having called a co-worker a racial slur, thus ratifying said false accusation and all of the damages flowing therefrom. These actions

1

were taken as the result of intentional discrimination against the Plaintiff due to her race (Caucasian) and Plaintiff's prior complaints of harassment and a hostile work environment. In so acting the Defendant thus deprived the Plaintiff of her rights, under federal law and the United States Constitution, to equal protection under the law and her right to racially non-discriminatory employment practices.

## JURISDICTION and VENUE

3. This civil rights action is brought pursuant to 42 U.S.C. §2000e *et seq*. This Court has jurisdiction over federal claims pursuant to the statutory provisions enumerated and 28 U.S.C. § 1331 and § 1343 (3) and (4), as they are brought to redress deprivations of rights privileges and immunities secured by the United States Constitution and by law.

4. Venue is proper in the Southern District of Georgia under 28 U.S.C. § 1391(b), in that Defendant holds authority over the federal military installation at Hunter Army Airfield located in this state and district and division, and a substantial part of the acts and/or omissions giving rise to Plaintiff's claim occurred in this district on said federal military installation.

## PARTIES

5. Plaintiff Jamie Kennedy (hereinafter "Kennedy") is a resident of Effingham County, Georgia. She is currently employed as a store worker under the Defense Commissary Agency ("the Agency") at Hunter Army Airfield.

6. Defendant Lloyd J. Austin III, is the Secretary of Defense and Head of the Department of Defense. In his capacity as the Secretary of Defense, the Defendant holds authority over the federal military installation at Hunter Army Airfield, located within the geographical boundaries

of Georgia, as well as having authority over all civilian personnel employed at that installation, including those employed by the Agency.

## FACTUAL BACKGROUND

### *The Initiation of Kennedy's Employment with the Commissary at Hunter Army Airfield*

7.  On or around May, 2019, Kennedy was hired as a cashier at the commissary on Hunter Army Airfield and was thereafter promoted to "Store Worker" on or around March 29, 2020." She holds that position as of the date of this filing.

8.  Kennedy is Caucasian.

9.  From the time of her promotion to Store Worker to the present, Kennedy's first line supervisor has been Vera Dunk ("Dunk"), whose position is that of Grocery Manager.  Dunk is African-American.

10.  At all times relevant hereto, Wade Broomfield ("Broomfield"), was Kennedy's second line supervisor.[1]  Broomfield's position is that of Deputy Store Manager.

11.  From her hiring until sometime in the spring of 2021, Kennedy's third line supervisor was Marites Pennington ("Pennington"), whose position is/was that of Store Manager. Pennington is Filipino-American.

12.  At all times relevant hereto, Pennington is/was Broomfield's first line supervisor.

13.  At all times relevant hereto, Ellistina Redman ("Redman"), was one of Kennedy's co-workers at the commissary, also holding the position of Store Worker.

---

[1] While Broomfield was Kennedy's second-line supervisor during much of the relevant period, his role in the events underlying this Complaint were primarily limited to that of a witness rather than a participant. For example, Broomfield had no input in the decision to suspend Kennedy.

*Atmosphere of Racial Animosity and Tension at the Commissary*

14. On or about October 2019, while Kennedy was working as a cashier, Kennedy overheard Roshonda Chavis ("Chavis"), another cashier, use the word "nigga" twice in a conversation with others co-workers in at the front of the store (a customer-frequented area) during normal business hours.

15. Kennedy complained to her supervisor at the time, front end manager Hope Joseph ("Joseph"), about Chavis' use of the word, which Kennedy felt was inappropriate and unprofessional.  Joseph in turn informed Broomfield, Kennedy's second line supervisor.

16. The day following Kennedy's complaint to Joseph, she was called into a meeting with Broomfield, Joseph, and Chavis, during which Davis' use of the word was discussed.  During said meeting, Chavis denied using the word.

17. No further action was taken to investigate the matter.

18. Chavis did not receive counseling, reprimand, or discipline, formal or informal, regarding the matter and it was not pursued further.

19. On or about April 2020, Pennington, Kennedy's third line supervisor, commented to Kennedy: "I only married [my ex-husband] to get out of the Philippines. I don't even like white guys."  This statement referred to Pennington's first husband, a Caucasian.

20. During the spring of 2020, Redman, a fellow Store Worker, made multiple comments to Kennedy expressing her displeasure when she learned that her son was marrying a white woman.  Redman also informed Kennedy that when Redman's son was younger, she would not

4

allow him to stay overnight with his white friends at their homes because she did not "trust white people to treat him well."

21. Redman openly used the word "nigger" in the workplace on multiple occasions. On at least one occasion Redman bragged to Kennedy after using the word, "yeah, I said it," in response to Kennedy's visible discomfort at Redman's use of the word.

### *History of Harassment of Kennedy by Redman Prior to December 16, 2020*

22. Sometime around the beginning of July of 2020, Redman advised Kennedy to "stay away from" Cassidie Alexander, another employee, because Alexander was a "spy." Alexander is Caucasian. Kennedy later relayed Redman's statements to Alexander. Based on this information, Alexander complained to Pennington that Redman was spreading rumors about her, and Pennington in turn addressed the matter with Redman.

23. The next day, Redman approached Kennedy and said "You got messy," referring to Kennedy's decision to inform Alexander of Redman's comments. Kennedy did not engage in further discussion with Redman at that time.

24. A day or two later, while Redman and Kennedy were on break in a gazebo outside the Commissary, Redman called Kennedy a "motherfucking bitch," among other profanity. Kennedy was taken aback by Redman's comments and left the area. Because this was the first negative incident between Kennedy and Redman, and Kennedy believed the issue would "blow over," Kennedy did not report Redman's abusive language toward her.

25. On July 16, 2020, Redman requested a meeting with Pennington, Broomfield, and Kennedy to discuss the ongoing tension between Kennedy and herself. At this meeting, Redman admitted to cursing at Kennedy in the gazebo the week prior. Redman also stated during this

meeting, in effect: "If I wanted to slap [Kennedy] like I wanted to, I could have, and [store

management] could not have held me accountable as I would have been on my break." At one

point during this meeting, Pennington stepped out of the room, during which time Redman told

Broomfield that she believed Kennedy was racist. Broomfield objected to Redman's

characterization, to which Redman stated in response that Kennedy had told her that she,

Kennedy, supported then-President Donald Trump.

26. At no time did Kennedy discuss her political affiliations and/or beliefs at work or

express her political affiliations and/or beliefs via a public format and therefore the same was not

discoverable by co-workers.

27. Between July 16, 2020, and December 16, 2020, Redman would frequently make eye

contact with Kennedy and assume a physically intimidating posture ("bowing up") toward

Kennedy when the two crossed paths during the workday.

28. During said time period Redman also physically blocked Kennedy's path multiple

times forcing Kennedy to divert her path to avoid Redman.

29. In another instance during this period, Kennedy had to ride in a motorized scooter at

work due to a back injury. Kennedy overheard Redman state to other employees within

Kennedy's hearing that Kennedy was "milking it."

30. During said time period, Redman began complaining to other employees within

Kennedy's hearing about Kennedy's work performance and keeping her work area clean.

31. On August 12, 2020, Kennedy initiated an EEO complaint due to the harassment by

Redman, but later withdrew it out of fear of reprisal.

32. Kennedy complained about Redman's actions to Dunk three or four times between July 16, 2020, and August 18, 2020, but as far as Kennedy is aware, Dunk took no corrective action in response to these complaints.  Kennedy began directing her complaints to Dunk because of Pennington's unwillingness to take any corrective action with Redman after the meeting on July 16, 2020.

33. On or about August 18, 2020, approximately one month after the meeting with Pennington and Broomfield, Kennedy complained to Dunk yet again about what Kennedy believed was an ongoing course of harassment by Redman.  Dunk promised to address the issue with Redman.  Later that day, Dunk confirmed to Kennedy that Dunk had spoken with Redman.  However, Redman's harassment of Kennedy continued.

34. Redman has confirmed in a sworn statement given during the later EEO investigation discussed *infra* that she was aware of Kennedy's complaints to Dunk made prior to December 16, 2020.

35. At no time prior to December 16, 2020, did Redman report any instance involving Kennedy acting aggressive, hostile, or making derogatory remarks pertaining to Redman or any other employee.

### *Incident of December 16, 2020*

36. On or about December 16, 2020, at approximately 11:00 A.M. Kennedy was in the administration office filling out paperwork.  Redman came up behind Kennedy and in an assertive tone said "Nineteen!"  Initially Kennedy believed Redman must be using her earbuds to speak to someone on the phone so she did not respond.  Redman then stated "Nineteen, I need key nineteen, give it to me!" in an overly aggressive tone and Kennedy realized that Redman was

speaking to her; Kennedy was caught off guard by Redman's tone and so Kennedy did not respond verbally. Kennedy held out her hand with the keys to Redman, who snatched them out of Kennedy's hand.

37. Key Nineteen was the key to several doors in the warehouse, including the receiving bay doors and the receiving office. Employees were required to keep the receiving office locked if they had no work to do in the office.

38. Kennedy continued to print out the forms that she had filled out. She gathered up the paperwork and made her way to the receiving office to complete her paperwork. Kennedy knew that Redman would be in the warehouse area because Redman had asked for Key Nineteen, and that if Redman was not in the receiving office, that Kennedy would have to seek Redman out in order to get Key Nineteen back from Redman to unlock the receiving office.

39. Based on Redman's overtly hostile tone in their interaction a few moments before; Redman's prior comments to Broomfield and Pennington that if she wanted to "slap" Kennedy there was not anything management could do; and the months-long course of harassment from Redman, Kennedy decided to use her cell phone to record what she feared would be a potentially negative, if not violent, encounter with Redman. Kennedy's decision to record was made out of fear and the potential need to protect herself if necessary with some kind of objective evidence.

40. As Kennedy approached the receiving office, Redman was standing just inside the office doorway. As Kennedy attempted to walk around Redman to enter the receiving office, the following verbal exchange between Kennedy and Redman took place (hereinafter "the incident"):[2]

_____

[2] The entirety of this exchange was captured in the recording made on Kennedy's phone ("the Recording").

8

Kennedy: Pardon me.
Redman: What the fuck did you just say to me?
Kennedy: I said pardon me.  Pardon me.
Redman: Don't play with me Jamie, I try not to say nothing to you. You already know I can't stand you.  Here's the keys.  Don't do that. Go ahead and tell Vera because I don't care anymore.
Kennedy: I said pardon me.
Redman: No, you did not.
Kennedy: Yes I did.  Then you should get your ears checked.
Redman: I don't need my fucking ears checked.  But if you call me another nigger, it's gonna be me and you, okay?
Kennedy: What? Nobody said that.
Redman: That's what you exactly said.
Kennedy: No it is not.  I've never called anybody that.
Redman: You just did.
Kennedy: Uh, no I didn't.
Redman: I'll make sure you pay for it. See if I don't do it.  Telling you right now. I don't appreciate that, honey.
(Redman leaves office).

41. During the incident Redman directly refers to Kennedy notifying Dunk of Redman's behavior *before* alleging that Kennedy used a racial slur.

42. Following this incident, Kennedy was shaking and upset.  In order to give herself time to calm down, Kennedy informed the meat manager, Mike Cobb ("Cobb"), that she needed to go to lunch.

43. After Kennedy returned from lunch, she informed Cobb of what had happened.

44. Cobb informed Kennedy during that same conversation that Joseph and Redman had already come to him to report that Kennedy had called Redman a "nigger."  Kennedy then produced the Recording on her phone and Cobb watched and listened to it.  Cobb agreed that he did not hear Kennedy use a racial slur on the Recording, told Kennedy that Kennedy "had nothing to worry about," and advised Kennedy not to delete the Recording.

9

### *Initial Investigation of the Incident*

45. Immediately after the incident, Redman reported to Joseph that Kennedy had called Redman a "nigger." Joseph then contacted the zone manager, Kenneth Murray ("Murray"), to inform him of the incident. Murray instructed Joseph to have anyone involved in the incident submit statements. Joseph also informed Pennington and Dunk about the incident.

46. On December 17, 2020, Kennedy was called into a meeting with Pennington and Dunk to discuss the incident. During the course of the meeting, Kennedy offered her phone to Pennington and Dunk so that they could both view the Recording. However, they refused to view the Recording at that time.

47. On December 18, 2020, Kennedy was again called into a meeting with Pennington and Dunk, who told Kennedy that Human Resources had instructed them to review the Recording. Pennington and Dunk both viewed the Recording at that time. Both stated later that they did not hear Kennedy call Redman a "nigger" in the Recording. During this same meeting, Pennington and Dunk accused Kennedy of harassing Redman.

48. A review of the Recording shows that Kennedy did in fact say "pardon me," and not "nigger." Despite reviewing the Recording, Pennington and Dunk nevertheless proceeded with disciplinary action against Kennedy and imposition of a "No-Contact" order.

### *No-Contact Order Imposed on Kennedy/Shift Change*

49. Kennedy was issued a "No-Contact" order ("NCO") on December 22, 2020. The NCO order specified that Kennedy was to have no contact with Redman. In accordance with the

10

NCO, Kennedy was taken off day shift and put on the evening shift, where she has remained as of the date of this Complaint.

50. No NCO was issued to Redman nor was she ever instructed to stay away from Kennedy.

51. The immediate effect of the NCO at the time it was issued was that Kennedy was placed immediately on evening shift and had to cancel a family visit from out-of-town relatives over the Christmas holiday.

52. Despite the Commissary's management's investigation having concluded upon issuance of the Notice of Proposed Suspension to Kennedy on February 26, 2021 (discussed *infra*), Kennedy was been informed by the acting store manager, Jovelyn Rountree, as recently as September 3, 2021, that the NCO still remains in effect.

53. The NCO still being in place has had the result of precluding employment opportunities for Kennedy, most recently when Kennedy wished to apply for a position in the meat department, a day-shift position.

### *Notice of Proposed Suspension*

54. Sometime between December 16, 2020, and February 26, 2021, Dunk consulted with Labor Management and Employee Relations Specialist DeAnda Glass ("Glass") as to how to proceed with disciplinary action against Kennedy.  Glass, for her part, was basing her advice to Dunk only on the information Dunk had provided to her, including the contents of the Recording.

55. Glass provided Dunk with a range of possible disciplinary actions for Kennedy, including written warning, letter of reprimand, and suspension.

56. Dunk decided on a seven day suspension, thereafter referring the proposed suspension to Pennington for final approval, which Pennington gave.

57. The Notice of Proposed Suspension was issued to Kennedy on February 26, 2021 ("Proposal"). The proposal sought a seven (7) day suspension for Kennedy.

58. Three grounds were relied upon in support of the Proposal:

> (1) that Kennedy had called Redman a "nigger" on December 16, 2020;
>
> (2) that Kennedy had, in directing a racial slur at Redman, subjected Redman to race-based harassment;
>
> (3) that Kennedy had violated DeCA policy by surreptitiously recording her interaction with Redman during the Incident.

59. By contrast, no corrective or disciplinary action of any kind related to the Incident has ever been taken against Redman.

60. Following issuance of the Proposal, The American Federation of Government Employees Local 1922 ("the Union"), issued a written response to the Proposal on behalf of Kennedy. This written response included its own transcribed version of the Recording, substantially similar to the one provided *supra*.

### *EEO Complaint Filed*

61. Kennedy filed an informal complaint with the EEO on December 17, 2020, based on claims of racial discrimination related to the Incident as well as long-standing un-redressed harassment and reprisal for prior complaints.

62. On February 1, 2021, Kennedy received a letter giving her leave to file a formal complaint ("the EEO Complaint") which she did on February 9, 2021.

63. An investigation into the EEO Complaint was thereafter initiated.

64. Following the issuance of the Proposal on February 26, 2021, Kennedy amended the EEO Complaint to include the proposed suspension against her.

65. Kennedy, on several occasions, offered to provide the Recording to the EEO investigator.  The EEO investigator refused to accept or review the Recording.  As a result, the EEO investigation included no review or examination of the Recording as evidence.

66. On the afternoon of June 2, 2021, a decision letter was issued upholding the Proposal's seven day suspension as well as all grounds supporting a suspension.

67. On the morning of June 3, 2021, the DeCA EEO investigator closed the investigation on Kennedy's EEO Complaint, precluding amendment of her Complaint to include the new adverse action.[3]

68. On August 23, 2021, the DeCA director issued a Final Decision on the EEO Complaint, denying Kennedy's claims for relief and opening the way for the instant Complaint to be filed.

69. Since July 2020 and continuing until the present time, Kennedy has been seeing a counselor in order to seek guidance in coping with the harassment, emotional distress, and damage to her personal and professional reputation as a result of the Agency's actions.

70. In September 2021, Kennedy sought to apply for a daytime position in the commissary meat department, but was informed that the NCO was still in place, which prevented Kennedy from taking a daytime position.

---

[3] Kennedy has since filed another EEO Complaint based on the decision to uphold and impose the seven day suspension.  This new complaint, which was permitted by an EEO counselor to proceed as a formal complaint, is currently in the investigatory stage.

71. No official disciplinary action of any kind has ever been taken against Redman for her conduct during the Incident or for any of her prior harassing conduct toward Kennedy. In addition, a NCO was only ever issued to, and binding upon, Kennedy.

## CLAIMS FOR RELIEF

## COUNT I

### (42 U.S.C. §2000e *et seq.*: Discrimination in Terms and Conditions of Employment)

Kennedy hereby re-alleges paragraphs 1- 71 of this Complaint as if fully alleged herein.

72. Defendant violated 42 U.S.C. § 2000e *et seq.* when employees of the Agency, including managers, intentionally engaged in discriminatory employment practices against Kennedy and subjected her to disparate treatment and harassment due to her race, notably:

(1) Ratifying and furthering Redman's false accusation against Kennedy of having called Redman a "nigger", an accusation especially damaging to Kennedy precisely because Kennedy is of a particular race (Caucasian);

(2) Ratifying and furthering Redman's false accusation against Kennedy of racially-motivated harassment of Redman, an accusation especially damaging to Kennedy precisely because Kennedy is of a particular race (Caucasian);

(3) Imposing a NCO of indefinite duration against Kennedy for punitive purposes while taking no comparable action toward Redman, even to the extent of making an NCO binding on Kennedy but not on Redman;

(4) Moving Kennedy to another shift indefinitely while taking no action whatsoever against Redman;

(5) Subjecting Kennedy to a prolonged period of harassment from Redman by its inaction, while furthering and contributing to its own harassment of Kennedy by seeking to punish only Kennedy (unjustifiably), while taking no action whatsoever against Redman;

73. Because of the actions of the Agency which are imputable to the Defendant, Kennedy has suffered injuries that entitle her to recover for certain damages.

74. Kennedy therefore seeks compensatory damages in accordance with 42 U.S.C. 1981a and section 706(g) of the Civil Rights Act of 1964, including but not limited to, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life (including stress to her marriage and social life), and other non pecuniary losses.

75. Kennedy also seeks pecuniary damages for the cost of therapy and lost employment opportunity.

76.  Because the total pecuniary and non pecuniary damages exceed the statutory cap set for compensatory damages under 42 U.S.C. 1981a(b)(3)(D) for employers with more than 500 employees, Kennedy seeks the statutory maximum of $300,000.00.

## COUNT II

### Attorney's Fees and Expenses of Litigation

76. 42 U.S.C. 1988 authorizes, and Kennedy therefore seeks, attorney's fees and expenses of litigation, including any expert fees.

**PRAYER FOR RELIEF**

WHEREFORE, the Plaintiff respectfully requests the following relief:

1. A trial by jury on all issues triable by a jury;

2. A finding that the Defendant engaged in intentional discriminatory employment practices against Kennedy due to her race;

3. A finding that the Defendant violated Plaintiff's rights under 42 U.S.C. § 2000e et seq. when federal employees under the Defendant's authority intentionally engaged in discriminatory employment practices against Kennedy and subjected her to disparate treatment and harassment due to her race;

4. A judgment awarding all compensatory damages, both pecuniary and non-pecuniary, sought by the Plaintiff including, but not limited to, emotional distress, inconvenience, humiliation, and damage to her reputation, in the amount of $300,000.00;

5. A judgment awarding all reasonable attorney's fees and costs of litigation sought by the Plaintiff in accordance with Title VII of the Civil Rights Act and 42 U.S.C.A. § 1988;

6. Equitable relief in the form of lifting the NCO, an apology to Kennedy published to the Commissary staff, and transfer of Redman to another facility; and

7. All other such relief as this Court deems just and proper.

16

Respectfully submitted this 20th day of November, 2021.

/s/ Scott G. Reddock
SCOTT G. REDDOCK
Georgia Bar No. 476162

/s/ Katie S. Mitchell
KATIE S. MITCHELL
Georgia Bar No. 106088
Attorneys for the Plaintiff

111 West Court St.
Hinesville, GA 31313
Phone (912) 332-7077
Facsimile (912) 332-7179