IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

| | |
|---|---|
| JAMIE KENNEDY,<br><br>      Plaintiff,<br><br>      v.<br><br>LLOYD J. AUSTIN III, in his official capacity as Secretary of the Department of Defense,<br><br>      Defendant. | CIVIL ACTION NO.: 4:21-cv-333 |

**O R D E R**

Presently before the Court is Defendant Lloyd J. Austin III's Motion to Dismiss Plaintiff Jamie Kennedy's Second Amended Complaint. (Doc. 37.) Plaintiff filed the instant action against Defendant, the United States Secretary of Defense, alleging that the Defense Commissary Agency (the "Agency")—an agency under Defendant's authority—engaged in racially discriminatory employment practices in violation of Title VII of the Civil Rights Act of 1974 ("Title VII"), 42 U.S.C. § 2000d *et seq*. (Doc. 1.) In her Second Amended Complaint, Plaintiff, who is white, alleges, *inter alia*, that she was harassed based on her race by an African American co-worker and was wrongfully disciplined for allegedly calling said worker a racial slur despite exculpatory evidence clearly showing that she did not use the slur. Defendant moves to dismiss Plaintiff's claims pursuant to Federal Rule of Civil Procedure 12(b)(6) on the grounds that Plaintiff failed to state a claim of race discrimination under Title VII. (Doc. 37.) The Court, however, finds *sua sponte* that Plaintiff's Second Amended Complaint is due to be dismissed, with leave to amend, on shotgun pleading grounds. Accordingly, the Court **DENIES as moot** Defendant's Motion to Dismiss. (Id.)

# BACKGROUND

**I.  Factual History**

The following facts are alleged in the Second Amended Complaint, (doc. 32).  Plaintiff is employed as a store worker within the Agency at Hunter Army Airfield (the "Airfield").  (Id. at p. 2.) Defendant, in his capacity as Secretary of Defense, possesses authority over the federal military installation at the Airfield, as well as all civilian personnel employed at that installation, including Agency employees.  (Id.)  Plaintiff, who is Caucasian, began working as a cashier at the commissary on the Airfield in May 2019, and was thereafter promoted to "Store Worker" in March 2020.  (Id. at p. 3.)  At all relevant times, Vera Dunk was Plaintiff's first line supervisor, and Wade Broomfield was her second line supervisor.  (Id.)  Dunk is African American.[1]  From her hiring until sometime in Spring 2021, Plaintiff's third line supervisor was Marites Pennington, the Store Manager at that time. (Id.)  Pennington is Filipina American.  (Id.)  Jovelyn Rountree took over as Store Manager in Spring 2021 and has been Plaintiff's third line supervisor since that time. (Id.) Rountree is African American.  (Id.)  At all relevant times, Plaintiff was co-workers with Ellistina Redman, who also held the position of Store Worker.  (Id.)  Redman is African American.  (Id. at p. 4.)

Sometime in early July 2020, Redman advised Plaintiff to "stay away from" Cassie Alexander, a Caucasian co-worker, because Alexander was a "spy."  (Id. at p. 5.)  Plaintiff relayed Redman's statements to Alexander, who complained to Pennington, who thereafter addressed the issue with Redman.  (Id.)  The following day, Redman told Plaintiff, "You got messy," which Plaintiff interpreted as referring to Plaintiff's decision to share Redman's "spy" comment with Alexander.  (Id.)  A day or two later, Redman called Plaintiff a "motherf---ing b----," among other

---

[1] The Second Amended Complaint does not allege Broomfield's race.  (See generally doc. 32.)

2

profanity, while on break outside the Commissary.[2]  Plaintiff did not report Redman's language towards her because this was the first negative incident between them, and she thought the issue would "blow over."  (Id.)  On July 16, 2020, Redman requested a meeting with Pennington, Broomfield, and Plaintiff to discuss their ongoing tension.  (Id.)  During the meeting, Redman admitted to cursing at Plaintiff and additionally stated, in effect, that she wanted to slap Plaintiff and could have done so without repercussions because she was on break.  (Id.)  Redman also told Broomfield outside of Pennington's presence that she believed Plaintiff was a racist.  (Id. at pp. 5–6.)  After Broomfield objected to Redman's characterization, Redman responded that Plaintiff told her she supported then-President Donald Trump.  (Id. at p. 6.)  Plaintiff alleges that she never discussed her political affiliations and/or beliefs at work or via any public format, so Redman could not have known Plaintiff's political affiliations.  (Id.)

Between July 16 and December 16, 2020, Redman frequently made eye contact with Plaintiff and assumed a physically intimidating posture (i.e., "bow[ed] up") toward Plaintiff when they crossed paths at work.  (Id.)  At some point during this period, while Plaintiff was using a motorized scooter at work due to a back injury, she overheard Redman state that she was "milking it."  (Id.)  Redman also began complaining to other employees about Plaintiff's work performance and the cleanliness of her workstation while she was in earshot.  (Id.)

Plaintiff complained about Redman's actions to Dunk three or four times between July 16 and August 18 but is not unaware of any corrective actions taken in response to her complaints.  (Id.)  Plaintiff alleges that she directed these complaints to Dunk instead of Pennington because Pennington was unwilling to take any corrective action against Redman after the July 16 meeting.

---

[2] While the Court ordinarily states the allegations in an unvarnished manner, it need not sully the record at this time. The precise profanity alleged is irrelevant to the Court's determination that the Second Amended Complaint is a shotgun pleading.  Accordingly, the Court has used dashes to replace some letters in the expletives reproduced in this Order.

3

(Id.)  On August 12, Plaintiff initiated a complaint with the Equal Employment Opportunity ("EEO") office due to Redman's harassment, but later withdrew it out of "fear of reprisal."  (Id.)  On August 18, after Plaintiff complained to Dunk again that Redman was harassing her, Dunk promised to address the issue with Redman.  (Id. at p. 7.)  Later that day, Dunk told Plaintiff that she had spoken with Redman.  (Id.)  However, according to Plaintiff, the harassment continued.  (Id.)

On December 16, 2020, Plaintiff was in the store's administrative office filling out paperwork when Redman came up behind her and demanded, in what Plaintiff describes as "an overly aggressive tone," that Plaintiff give her a certain key which opened several doors in the warehouse, including the receiving office.  (Id.)  Plaintiff held out the key, and Redman snatched it from Plaintiff's hand.  (Id.)  Plaintiff then proceeded to gather her paperwork and head towards the receiving office to complete her paperwork.  (Id. at p. 8.)  Employees were required to keep the receiving office locked unless they were working in it, so Plaintiff knew that if Redman was not in the office, she would have to retrieve the key from her to open the door.  (Id. at pp. 7–8.)  Based on her prior encounters with Redman, Plaintiff feared a potentially negative or violent encounter with Redman, so she decided to record a video of their potential encounter.  (Id. at p. 8.)  As Plaintiff approached the receiving office, Redman was standing inside the doorway.  (Id.)  The following verbal exchange took place and was video recorded by Plaintiff:

> Plaintiff:    Pardon me.
>
> Redman:     What the f--- did you just say to me?
>
> Plaintiff:    I said pardon me.  Pardon me.
>
> Redman:     Don't play with me Jamie, I try not to say nothing to you.  You already know I can't stand you.  Here's the keys.  Don't do that.  Go ahead and tell [Dunk] because I don't care anymore.

| | |
|---|---|
| Plaintiff: | I said pardon me. |
| Redman: | No, you did not. |
| Plaintiff: | Yes I did.  Then you should get your ears checked. |
| Redman: | I don't need my f---ing ears checked.  But if you call me another n-----,[3] it's gonna be me and you, okay? |
| Plaintiff: | What?  Nobody said that. |
| Redman: | That's what you exactly said. |
| Plaintiff: | No it is not.  I've never called anybody that. |
| Redman: | You just did. |
| Plaintiff: | Uh, no I didn't. |
| Redman: | I'll make sure you pay for it.  See if I don't do it.  Telling you right now.  I don't appreciate that, honey. |

(Id. at pp. 8–9.) Plaintiff alleges that the video recording captures the entirety of the exchange and that neither Plaintiff nor anyone else uttered any words until the exchange began as transcribed above. (Id. at p. 8 n.2.)

Immediately after the incident, Redman told Hope Joseph, the store's front-end manager at the time, that Plaintiff called her the n-word. (Id. at p. 9.) Joseph then told Pennington and Dunk about the incident. (Id.) Because Plaintiff was shaking and upset, she informed the manager of the meat department, Mike Cobb, that she needed to go to lunch. (Id. at p. 9.) When she returned, she told Cobb what happened, and Cobb stated that Joseph and Redman had already come to him to report that Plaintiff had called Redman the n-word. (Id.) Plaintiff then produced the recording on her phone, and Cobb agreed that he did not hear her using that slur on the

---

[3] Henceforth, the Court will refer to this slur as the "n-word."

5

recording.  (Id.)  He then told Plaintiff she "had nothing to worry about" and advised her not to delete the recording.  (Id.)

In the following days, Kennedy met with Pennington and Dunk twice to discuss the incident.  (Id. at pp. 9–10.)  During the first meeting, Plaintiff offered her phone to Pennington and Dunk for them to view the recording, but they both refused.  (Id.)  However, Pennington and Dunk listened to the recording during the second meeting at the instruction of someone with human resources.  (Id. at p. 10.)  Both stated later that they did not hear Plaintiff call Redman the n-word in the recording.  (Id.)  Plaintiff alleges, however, that, during that same meeting, they accused her of harassing Redman.  (Id.)

According to Plaintiff, despite reviewing the recording, which showed Redman using profanity, acting aggressively, and threatening her, Pennington and Dunk issued Plaintiff a "no-contact" order ("NCO") on December 22, 2020.  (Id.)  The NCO specified that Plaintiff was not to have any contact with Redman.  (Id.)  In accordance with the NCO, Plaintiff was moved from the day shift to the evening shift.  (Id.)  Redman was not issued an NCO or instructed to stay away from Kennedy.  (Id.)  The NCO and shift change were still in effect on November 17, 2022, when Plaintiff filed the Second Amended Complaint.  (Id.)

At some point after the incident, Dunk consulted with Labor Management and Employee Relations Specialist DeAnda Glass as to how to proceed with disciplinary action against Plaintiff.  (Id. at p. 11.)  Glass told Dunk that she had a range of options, including a written warning, letter of reprimand, and suspension.  (Id.)  Dunk decided on a seven-day suspension and referred the proposal to Pennington, who approved it.  (Id.)  The Notice of Proposed Suspension issued to Plaintiff on February 26, 2021, states that a seven-day suspension was appropriate because Plaintiff: (1) called Redman the n-word on December 16; (2) had, in directing a racial slur at

Redman, racially harassed Redman; and (3) violated the Agency's policy against recording in the workplace by surreptitiously recording her interaction with Redman on December 16. (Id. at pp. 11–12.) On June 2, 2021, Rountree issued a decision letter which upheld the Proposal's seven-day suspension as well as the grounds supporting it. (Id. at pp. 12–13.)

## II.    Procedural History

Plaintiff filed an informal complaint with the Agency's EEO office on December 17, 2020, alleging racial discrimination related to the December 16 incident as well as "long-standing un-redressed harassment and reprisal for prior complaints." (Id. at p. 12.) Plaintiff received leave to file a formal complaint with the EEO on February 1, 2021, which she did on February 9. (Id.) The EEO thereafter began investigating the complaint. (Id.) After the issuance of the Notice of Proposed Suspension, Plaintiff amended her EEO Complaint to include it. (Id.) On August 23, 2021, the Agency's director issued a "Final Decision" on the first EEO complaint, denying Plaintiff's claims for relief.[4] (Id. at p. 13.)

Plaintiff initiated this action on November 21, 2021. (Doc. 1.) The Second Amended Complaint sole substantive count, Count I, alleges that Defendant violated Title VII when "employees of the Agency, including her managers, intentionally engaged in discriminatory employment practices against [her] and subjected her to disparate treatment and harassment due to her race." (Doc. 32, p. 14.) Defendant filed the at-issue Motion to Dismiss the Second Amended Complaint pursuant to Rule 12(b)(6), generally arguing that Plaintiff failed to identify a similarly

---

[4] According to the Second Amended Complaint, Plaintiff filed a second EEO complaint about Rountree's decision to uphold the proposed suspension and suspend her. (Doc. 32, p. 13.) On March 29, 2022, the Agency's director issued a Final Decision on Plaintiff's second complaint, concluding that Plaintiff's suspension constituted "unlawful disparate treatment based on race." (Id.) Plaintiff clarifies that "all compensatory damages related to the decision to suspend [her] issued on June 2, 2021, are being addressed in a separate administrative proceeding," and, thus, she does not seek compensatory damages for that decision in this case. (Id. at p. 13 n.3.)

situated comparator and did not allege harassment which was sufficiently severe or pervasive to be actionable race discrimination. (Doc. 37.) Plaintiff filed a Response, (doc. 40), and Defendant filed a Reply, (doc. 41).

As set forth below, the Court finds that the Second Amended Complaint is due to be dismissed without prejudice, and with leave to amend, on different grounds: the Second Amended Complaint is a shotgun pleading which fails to separate Plaintiff's claims into different counts and, due to its formatting and composition, does not adequately notify Defendant of the precise grounds on which each claim rests.

## DISCUSSION

### I.   Overview of Title VII Discrimination Claims

Title VII makes it "unlawful" for an employer to "discharge . . . or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . ." 42 U.S.C. § 2000e-2(a)(1). To be actionable, discriminatory treatment must reach a sufficient level of substantiality. Monaghan v. Worldpay US, Inc., 955 F.3d 855, 860 (11th Cir. 2020). "Tangible" or "adverse" employment actions are discrete acts which "are substantial enough standing alone to be actionable," such as termination, refusal to hire, demotions, failure to promote, suspensions without pay, and pay raises or cuts. Id.; McCann v. Tillman, 526 F.3d 1370, 1378 (11th Cir. 2008). When a plaintiff claims that they suffered a tangible or adverse employment action because of their race or some other prohibited characteristic, courts refer to the claim as a "disparate-treatment claim." Monaghan, 955 F.3d at 860. In contrast, a "hostile work environment" claim involves "a series of separate acts" which "collectively constitute one unlawful employment practice." McCann, 526 F.3d at 1378 (internal quotations omitted). Unlike discrete acts, hostile work environment claims involve "repeated

8

conduct," such as "discriminatory intimidation, ridicule, and insult." Id. These claims are actionable even though they may "not rise to the level of a tangible employment action," but only if the mistreatment is "sufficiently severe and pervasive" to alter the terms, conditions, or privileges of employment. Monaghan, 955 F.3d at 861. Hostile work environment claims are "different in kind" from disparate-treatment claims because they are "based on the cumulative [e]ffect of individual acts" of harassment which may not be independently actionable. Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 115 (2002).

Consequently, while both arising under Section 2000e-2(a)(1), disparate-treatment claims and hostile work environment claims are analyzed differently. Claims of disparate treatment ordinarily are analyzed under the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802–03 (1973). Maynard v. Bd. Of Regents of Div. of Univs. Of Fla. Dep't of Educ., 342 F.3d 1281, 1289 (11th Cir. 2003). Under this framework, a plaintiff must first establish a prima facie case of discrimination, one element of which is that the plaintiff suffered an adverse employment action. McDonnell Douglas, 411 U.S. at 802; see Pape v. Dircksen & Talleyrand Inc., No. 16-CV-5377-MKB-SJB, 2019 WL 1435882, at *10 (E.D.N.Y. Feb. 1, 2019) ("McDonnell Douglas, because it applies to employment claims based on a single event, requires a plaintiff to, among other things, establish that he suffered an adverse employment action."). However, "[t]he McDonnell-Douglas burden-shifting framework does not apply to claims for hostile work environment." Quarles v. Con-Way Freight, Inc., No. 8:07-cv-200-T-27MAP, 2008 WL 1994916, at *5 (M.D. Fla. May 8, 2008) (citing Johnson v. Booker T. Washington Broad. Serv., Inc., 234 F.3d 501, 510 (11th Cir. 2000)); see Araya v. Fulton-DeKalb Hosp. Auth., No. 1:08-CV-1732-TCB-AJB, 2009 WL 10664777, at *17 (N.D. Ga. Aug. 19, 2009) (stating that McDonnell Douglas is the "wrong standard" for race-based hostile work environment claims).

Instead, to prevail on a hostile environment claim, the plaintiff must prove that they endured harassment, based upon a protected characteristic, that was "sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment." Palmer v. McDonald, 624 Fed. App'x 699, 703 (11th Cir. 2015). Additionally, the plaintiff must show that "the employer is responsible for such environment under either a theory of vicarious or of direct liability." McCann, 526 F. 3d at 1378.

## II.    Shotgun Pleading

Count I of the Second Amended Complaint alleges that "Defendant violated 42 U.S.C. § 2000e *et seq.* when employees of the Agency, including managers, intentionally engaged in discriminatory employment practices against Kennedy and subjected her to *disparate treatment* and *harassment* due to her race." (Doc. 32, p. 14 (emphasis added).) Although Plaintiff does not explicitly allege within Count I that the Agency subjected her to a hostile work environment, she does so in Paragraph 1 of the Second Amended Complaint. (See id. at p. 1 (alleging that Defendant "subject[ed] her to a hostile work environment due to her race").) Moreover, Plaintiff's Response describes her claims as (1) "Racial Discrimination . . . Based on Disparate Treatment" and (2) "Race-Based Harassment/*Hostile Work Environment*." (Doc. 40.) Thus, the Court construes Count I as seeking to assert both a disparate treatment claim and a hostile work environment claim pursuant to Section 2000e-2(a)(1).

While not argued by Defendant, the Court finds the Second Amended Complaint to be a "shotgun pleading." Shotgun pleadings are pleadings that violate either Federal Rule of Procedure 8(a)(2) or Rule 10(b). Weiland v. Palm Beach Cnty. Sheriff's Office, 792 F.3d 1313, 1320 (11th Cir. 2015). "A district court has the inherent authority to control its docket and ensure the prompt resolution of lawsuits, which includes the ability to dismiss a complaint on shotgun pleading

10

grounds." Vibe Micro, Inc. v. Shabanets, 878 F.3d 1291, 1295 (11th Cir. 2018) (internal quotations omitted). The Court may do so *sua sponte*. U.S. ex rel. Atkins v. McInteer, 470 F.3d 1350, 1354 n.6 (11th Cir. 2006) ("When faced with a shotgun pleading, the trial court, whether or not requested to do so by the party's adversary, ought to require the party to file a repleader.").

The Eleventh Circuit Court of Appeals has identified "four rough types" of shotgun pleadings: (1) "a complaint containing multiple counts where each count adopts the allegations of all preceding counts;" (2) a complaint that contains "conclusory, vague, and immaterial facts not obviously connected to any particular cause of action;" (3) a complaint that fails to "separat[e] into a different count each cause of action or claim for relief;" and (4) a complaint that "assert[s] multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions, or which of the defendants the claim is brought against." Weiland, 792 F.3d at 1321–23. "The unifying characteristic of all types of shotgun pleadings is that they fail to one degree or another, and in one way or another, to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests." Id. at 1323.

Count I of the Second Amended Complaint "commits the sin of not separating into a different count each cause of action or claim for relief" because it contains a disparate treatment claim *and* a hostile work environment claim. Id. As set forth in detail above, disparate treatment and hostile work environment are distinct theories of discrimination and, thus, are analyzed separately, *even though* they both arise under Section 2000e-2(a)(1). See Monaghan, 955 F.3d at 860–61; Morgan, 536 U.S. at 115–116. Accordingly, as numerous courts in this Circuit and elsewhere have found, complaints which fail to separate them and combine them into the same count are shotgun pleadings. See, e.g., Desrouleaux v. Quest Diagnostics, Inc., No. 09-61672-CIV, 2010 WL 1571188, at *2 (S.D. Fla. Apr. 20, 2010) (finding that a complaint which referenced

both a disparate treatment and hostile work environment claim in one count violated Rule 10(b)'s "one-claim-per-count[ ]rule"); Garvey v. Sec'y, United States Dep't of Lab., No. 8:22-CV-2309-WFJ-AEP, 2023 WL 3057474, at *3 (M.D. Fla. Apr. 24, 2023) ("[I]f [a] plaintiff is alleging hostile work environment, disparate treatment, wrongful termination, or unlawful retaliatory discharge, each of those distinct legal claims or legal theories requires a separate count."); Griffin v. Ellingson, No. 2:13-CV-189-WCO-JCF, 2013 WL 12177999, at *2 (N.D. Ga. Dec. 31, 2013) (granting motion for more definite statement where the plaintiff alleged, among other claims, disparate treatment and hostile work environment claims based on his race, because these "are separate and distinct claims with different defenses and burdens of proof, and therefore, should not be alleged in a single count"); Bone v. All. Inv. Co., LLC, No. 5:18-CV-01706-LCB, 2020 WL 5984017, at *9 (N.D. Ala. Oct. 8, 2020) (noting that alleging "both a hostile work environment claim and a disparate treatment claim" in the same count "would constitute impermissible shotgun pleading because two causes of action would be contained in a single count, and hostile work environment and disparate treatment claims have different elements").[5]

---

[5] The only analogous case reaching a different conclusion that the Court has been able to locate is Harris v. Centurion of Fla., LLC, No. 3:19CV4939-TKW-EMT, 2020 WL 9749508 (N.D. Fla. Jan. 14, 2020). There, as in this case, the plaintiff alleged race-based disparate treatment and hostile work environment claims in a single count. Id. at *1. The Court rejected the defendant's motion to dismiss on shotgun pleading grounds. Id. The court reasoned that the complaint was not a shotgun pleading because "a hostile work environment can be a form of disparate treatment." Id. (citing Reeves v. C.H. Robinson Worldwide, Inc., 594 F.3d 798, 807 (11th Cir. 2010)). The Court is not persuaded by this authority from another district court. In Reeves, the Eleventh Circuit explained in dicta that the two broad categories of discrimination prohibited by Section 2000e-2 are "disparate impact" and "disparate treatment," and that the latter "can take the form either of a tangible employment action, such as a firing or demotion, or of a hostile work environment that changes the terms and conditions of employment." 594 F.3d at 807 (internal quotations omitted). The fact that hostile environment is a type of disparate treatment—as opposed to disparate *impact*—is inapposite. The factual circumstances giving rise to—and the elements of proving—hostile work environment claims are distinct from claims involving tangible employment actions, which are usually referred to (somewhat confusingly) as "disparate-treatment claim[s]." See Monaghan, 955 F.3d at 860–61; see also Discussion Section I, supra. Indeed, Reeves implicitly distinguished between the types of disparate treatment claims by employing the disjunctive term "or." See 594 F.3d at 807 (explaining that disparate treatment takes the form of a "tangible employment action . . . *or* of a hostile work environment") (emphasis added) (internal quotations omitted). Harris recognized this distinction as well. See 2020 WL

12

Another problem with the Second Amended Complaint is that it does not clearly notify Defendant of the precise grounds on which each claim is based. Count I's primary substantive allegation, paragraph 76, is one long, rambling sentence which provides:

> Defendant violated 42 U.S.C. § 2000e *et seq.* when employees of the Agency . . . subjected [Plaintiff] to disparate treatment and harassment due to her race, notably:
>
> (1) In seeking disciplinary action against [Plaintiff] and not Redman, ratifying and furthering Redman's false accusation against [Plaintiff] of having called Redman a "[n-word]", an accusation especially damaging to [Plaintiff] precisely because [Plaintiff] is of a particular race (Caucasian);
>
> (2) In seeking disciplinary action against [Plaintiff] and not Redman, ratifying and furthering Redman's false accusation against [Plaintiff] of racially-motivated harassment of Redman, an accusation especially damaging to [Plaintiff] precisely because [Plaintiff] is of a particular race (Caucasian);
>
> (3) Despite reviewing exculpatory evidence, imposing a[n] NCO of indefinite duration against [Plaintiff] for punitive purposes while taking no comparable action toward Redman, even to the extent of making an NCO binding on [Plaintiff] but not on Redman;
>
> (4) Despite reviewing exculpatory evidence, moving [Plaintiff] to another shift indefinitely while taking no action whatsoever against Redman;
>
> (5) Subjecting [Plaintiff] to a prolonged period of harassment from Redman by its inaction, while furthering and contributing to its own harassment of [Plaintiff] by seeking to punish only [Plaintiff] (unjustifiably), while taking no action whatsoever against Redman.

---

9749508, at *1 (conceding that the "better practice would have been to allege the race-based disparate treatment and hostile work environment claims in separate counts because they *contain different elements of proof*") (emphasis added). Accordingly, the Court sides with the numerous courts that have found that a pleading which fails to separate these claims into different counts constitutes an impermissible shotgun pleading.

13

(Doc. 32, pp. 14–15.)  This sentence's composition makes it difficult to read and interpret.  For instance, read in context, it incomprehensibly alleges that employees of the Agency "subjected [Plaintiff] to disparate treatment and harassment . . . notably . . . [s]*ubjecting* [Plaintiff] to a prolonged period of harassment from Redman, while furthering and contributing to *its* own harassment of [Plaintiff] by seeking to punish only [Plaintiff] (unjustifiably), while taking no action whatsoever against Redman."  (Id. (emphasis added to show improper use of present participle and improper pronoun, respectively).)  Furthermore, its formatting and grammar make it unclear whether Plaintiff intended for each numbered allegation to support her claims of disparate treatment *and* hostile work environment, or to support one but not the other.  Because Paragraph 76 refers collectively to "disparate treatment and harassment" and proceeds, within the same sentence, to list the five allegations, the most plausible reading is that each numbered paragraph corresponds to both claims.  Id. at pp. 14–15.  This would mean that Plaintiff is alleging that the Defendant's conduct in response to Plaintiff's alleged use a racial slur (i.e., issuance of the NCO, changing Plaintiff's shift, and proposing that Plaintiff be suspended) resulted a hostile work environment.[6]  On the other hand, it is equally plausible that Plaintiff meant for the first four allegations (which deal with "seeking disciplinary action," the NCO, and shift change) to support only her disparate treatment claim.  (Doc. 32, pp. 14–15.)  Indeed, paragraph 1 of the Second Amended Complaint—which is incorporated into Count I—appears to treat the NCO, shift change,

---

[6] This could be problematic as the Eleventh Circuit has clarified that challenges concerning discrete acts—such as, here, disciplinary decisions made in response to a single event—"cannot be brought under a hostile work environment claim that centers on 'discriminatory intimidation, ridicule, and insult.'" McCann, 526 F.3d at 1379 (quoting Morgan, 536 U.S. at 116); see McCann v. Mobile Cnty. Pers. Bd., No. CIV A. 05-0364-WS-B, 2006 WL 1867486, at *20 (S.D. Ala. July 6, 2006), *aff'd sub nom.*, McCann, 526 F.3d 1370 ("[D]iscrete discriminatory acts must be challenged as separate statutory violations and not lumped together under the rubric of hostile work environment.").  Defendant could argue that the allegations regarding how Defendant handled Redman's accusation and disciplined Plaintiff do not involve the sort of *severe and pervasive* intimidation, ridicule, and insult necessary to support a claim for hostile work environment.

and proposed suspension as separate acts from whatever Plaintiff contends created a hostile environment. (Id. at p. 32, p. 1 (stating that Plaintiff requests damages resulting from racially discriminatory employment actions, including "subjecting her to a hostile work environment due to her race, imposition of a [NCO], placing [her] on an alternate shift, and proposing a seven . . . day suspension").) However, it is impossible to know based on the way the Second Amended Complaint is drafted. This lack of clarity is compounded by the fact that Count I incorporates *every* prior allegation contained in the Second Amended Complaint—including those set forth in the "Introduction" and "Parties" sections and the entire "Factual Background" section—without specifying which facts relate to which cause of action. (See id. at p. 14.)

Finally, the Second Amended Complaint could also be read to assert a constitutional claim pursuant to 42 U.S.C. § 1981. Paragraph 1 of the Second Amended Complaint states in relevant part that Defendant "deprived . . . Plaintiff of her rights, under federal law *and the United States Constitution*, *to equal protection under the law* . . . ." (Id. at p. 2 (emphasis added).) Count I also explicitly alleges that Plaintiff seeks compensatory damages under Section 1981. (Id. at p. 15.) This is problematic for multiple reasons. First, it exacerbates Plaintiff's "sin" of jamming distinct claims into the same count and failing to clearly identify which facts correspond to which claim. Second, Plaintiff has alleged that she is "currently employed as a store worker under the . . . Agency . . . at [the] Airfield." (Id. at p. 2.) To the extent Plaintiff is alleging she is a federal employee, this would foreclose her opportunity to recover under Section 1981. See Brown v. Gen. Servs. Admin., 425 U.S. 820, 835 (1976) (holding that Title VII "provides the exclusive judicial remedy for claims of discrimination in federal employment"); see also Torre v. Barry, 661 F.2d 1371, 1374 (D.C. Cir. 1981) ("[A] federal employee who is covered by [Title VII] may not sue under [S]ection 1981 . . . ."); Lee v. Hughes, 145 F.3d 1272, 1277 (11th Cir. 1998) ("Section 1981 provides a cause

of action for individuals subjected to discrimination by *private actors* and discrimination under color of *state law*, but does not provide a cause of action for discrimination under color of *federal law*.") (emphasis added).

In sum, the Second Amended Complaint is a shotgun pleading that asserts multiple claims (one of which, the potential Section 1981 claim, may not be viable) into a single count and fails to clarify which factual allegations support each claim. Accordingly, it must be replead before the case may proceed.

## CONCLUSION

"Experience teaches that, unless cases are pled clearly and precisely, issues are not joined, discovery is not controlled, the trial court's docket becomes unmanageable, the litigants suffer, and society loses confidence in the court's ability to administer justice." Anderson v. Dist. Bd. of Trs. of Cent. Fla. Cmty. Coll., 77 F.3d 364, 367 (11th Cir. 1996). Because Plaintiff failed to separate her claims into different counts and it is "virtually impossible to know which allegations of fact are intended to support which claim(s) for relief," the Second Amended Complaint is a shotgun pleading which must be replead. Id. at 366. Accordingly, the Court **DISMISSES without prejudice** Plaintiff Jamie Kennedy's Second Amended Complaint, (doc. 32), and **DENIES as moot** Defendant's Motion to Dismiss, (doc. 37). The Court **ORDERS** Plaintiff to file an amended complaint (to be titled, "Third Amended Complaint"), which separates her causes of action into different counts and more clearly identifies the legal authority and factual allegations supporting each count. The Third Amended Complaint must be filed **within fourteen (14) days** of this Order. Once Plaintiff files the Third Amended Complaint, Defendant will have **twenty-one (21) days** to answer or to file, if he so chooses, a renewed motion to dismiss. Should Defendant choose to file

a motion, Plaintiff will have **fourteen (14) days** to file a response. If she files a response, Defendant will have **fourteen (14) days** to file a reply.

    **SO ORDERED**, this 9th day of June, 2023.

_____
R. STAN BAKER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF GEORGIA