UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

| | |
|---|---|
| JAMIE KENNEDY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 4:21-CV-333 |
| ) | |
| LLOYD J. AUSTIN III, ) | |
| ) | |
| Defendant. ) | |

**DEFENDANT'S MOTION TO DISMISS
THE THIRD AMENDED COMPLAINT**

Plaintiff Jamie Kennedy sues defendant Lloyd J. Austin III, the Secretary of the Department of Defense, for allegedly violating Title VII. Kennedy, a Caucasian employee of the Defense Commissary Agency (DeCA), a component of the Department of Defense, alleges she was subjected to disparate treatment due to her race after Kennedy was accused of calling an African American coworker, Ellistina Redman, a racial epithet and violating DeCA policy by recording her conversation with Redman without consent. Kennedy contends her supervisors proposed to suspend her, changed her shift, and ordered her to have no contact with Redman, even though Kennedy had presented "objective recorded evidence exculpatory of Kennedy and inculpatory of Redman." Doc. 45 at 15.

The Court should dismiss Kennedy's Third Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(6). The mere proposal of a suspension is not adverse employment action necessary to sustain a claim of disparate treatment, so that claim should be dismissed. Moreover, Kennedy's disparate treatment claims fail because she does not

plausibly allege causation between her race and an adverse employment action. Kennedy does not allege that either of her two proposed comparators are sufficiently similar in all material respects, nor does she allege any other basis to infer causation. And, to the extent Kennedy's Third Amended Complaint might be read to allege a claim under 42 U.S.C. § 1981, the Court should dismiss it because that statute does not redress violations by the federal government.

## BACKGROUND

Owing to the standard of review applicable to motions to dismiss made under Fed. R. Civ. P. 12(b)(6), the following facts are taken from Kennedy's Third Amended Complaint and assumed as true for purposes of this motion only. Kennedy was, at the relevant time, a Caucasian employee of DeCA who began working as a cashier at the commissary at Hunter Army Airfield in May 2019. Doc. 45 at ¶¶ 6-7. While employed as cashier, Hope Joseph, front-end manager, was Kennedy's immediate supervisor; Deputy Store Manager Wade Broomfield was Kennedy's second-line supervisor; and Store Manager Marites Pennington was Kennedy's third-line supervisor. *Id.* at ¶¶ 9-10, 16.

Sometime in October 2019, Kennedy overheard Roshonda Davis, another cashier, use a racial slur twice during conversation with other coworkers in the front area of the store. *Id.* at ¶ 15. Kennedy reported Davis's language to her supervisor at the time, Joseph, who subsequently informed Broomfield. *Id.* at ¶ 16. Broomfield, Joseph, Davis, and Kennedy met the following day and Davis denied the statement. *Id.* at ¶ 17. No further action was taken to investigate Kennedy's accusation or to

discipline Davis. *Id.* at ¶¶ 18-19.

Kennedy was promoted to the role of store worker on March 29, 2020. *Id.* at ¶ 6. Her immediate supervisor changed from Joseph to Grocery Manager Vera Dunk, while Broomfield and Pennington remained as Kennedy's second- and third-line supervisors. *Id.* at ¶¶ 8-10. At some point in the spring of 2021, Jovelyn Rountree replaced Pennington as Store Manager and Kennedy's third-line supervisor. *Id.* at ¶ 11. The Third Amended Complaint alleges that Dunk is African American, Pennington is Filipina American, and Rountree is African American. *Id.* at ¶¶ 8, 10-11. In April 2020, Pennington allegedly remarked to Kennedy that she had married her ex-husband, who is alleged to be Caucasian, to get out of the Philippines but that Pennington does not "even like white guys." *Id.* at ¶ 20.

Much of Kennedy's complaint concerns interactions with Ellistina Redman, a fellow store worker who is alleged to be African American. In Spring 2020, Redman allegedly commented to Kennedy that she was unhappy Redman's son would be marrying a white woman and recalled that, when her son was younger, Redman would not allow him to stay overnight with white friends because Redman did not "trust white people to treat him well." *Id.* at ¶ 21. Kennedy alleges that Redman used racial slurs in the workplace multiple times. *Id.* at ¶ 22. Kennedy does not claim she ever notified any of Kennedy's or Redman's supervisors regarding Redman's use of these epithets or Redman's comments regarding her son.

In July 2020, Redman warned Kennedy to avoid interacting with Cassadie Alexander, whom Redman believed to be a "spy." *Id.* at ¶ 23. Kennedy relayed

Redman's warning to Alexander, who complained to Pennington, who in turn addressed the matter with Redman. *Id.* Redman later told Kennedy that Kennedy "got messy" and, during a break outside the store a few days later, Redman allegedly shouted profanities at Kennedy, which included calling Kennedy a "motherfucking bitch." *Id.* at ¶¶ 24-25. Redman requested a meeting with Pennington, Broomfield, and Kennedy regarding "the ongoing tension" between Redman and Kennedy. *Id.* at ¶ 26. The meeting occurred on July 16, 2020. *Id.* Redman admitted to cursing at Kennedy and allegedly stated that she could have slapped Kennedy while on break without any repercussions from her job. *Id.* Outside Pennington's presence, Redman allegedly told Broomfield that Kennedy was a racist and supported former President Trump. *Id.*

Kennedy's relationship with Redman did not improve. Following the meeting with Pennington and Broomfield, Kennedy alleges Redman "would frequently make eye contact with Kennedy" and, when crossing paths, "assume[d] a physically intimidating posture ('bowing up')" or "physically block[ed] Kennedy's path." *Id.* at ¶¶ 28, 29. When Kennedy rode a motorized scooter due to a back injury, Kennedy allegedly heard Redman remark to other coworkers that Kennedy was "milking it." *Id.* at ¶ 30. Redman also began complaining to coworkers about Kennedy's work performance and the cleanliness of Kennedy's work area. *Id.* at ¶ 31. Kennedy initiated contact with an EEO counselor regarding her interactions with Redman on August 12, 2020, but did not proceed with a formal complaint. *Id.* at ¶ 32. Kennedy alleges she complained to Dunk, Kennedy's immediate supervisor, about Redman

4

three or four times between July 16, 2020, and August 18, 2020, and again on August 18, 2020, but Kennedy is not aware of any corrective action being taken in response. *Id.* at ¶¶ 33, 34.

Matters between Kennedy and Redman came to a head on December 16, 2020. Redman allegedly came up behind Kennedy in the administration office while Kennedy was filling out paperwork and demanded a key in an "overly aggressive tone." *Id.* at ¶ 37. Redman then "snatched" the key out of Kennedy's hand. *Id.* Kennedy later approached an office door where Redman was standing nearby and used her cell phone to record her interaction with Redman. *Id.* at ¶¶ 39-41. As Kennedy attempted to walk around Redman, Kennedy allegedly said, "Pardon me." *Id.* at ¶ 41. Redman, however, accused Kennedy of calling Redman a racial epithet and said that she would "make sure" that Kennedy "pay for it." *Id.*

Kennedy then informed the meat manager, Mike Cobb, that Kennedy needed to go to lunch. *Id.* at ¶ 43. In contrast, Redman reported the exchange to Joseph, including Redman's claim that Kennedy called her a racial epithet. *Id.* at ¶ 46. Joseph, in turn, contacted the zone manager, Kenneth Murray. *Id.* Murray directed Joseph to obtain statements from everyone involved in the incident. *Id.* Joseph also notified Pennington and Dunk regarding what occurred. *Id.*

When Kennedy returned from lunch, she informed Cobb of what happened between her and Redman. *Id.* at ¶ 44. Cobb advised that Redman, accompanied by Joseph, already had come to him to report that Kennedy called Redman a racial epithet. *Id.* at ¶ 45. Kennedy then played her cell phone recording for Cobb, who

agreed he could not hear Kennedy use a racial slur, assured Kennedy she had nothing to worry about, and told Kennedy not to delete the recording. *Id.*

Pennington and Dunk called Kennedy into a meeting the following day, December 17, 2020, where they declined Kennedy's offer to review Kennedy's cell phone recording. *Id.* at ¶ 47. Pennington and Dunk convened a second meeting with Kennedy on December 18, 2020, and relayed that Human Resources had authorized them to review the cell phone recording. *Id.* at ¶ 48. Both Pennington and Dunk told Kennedy they could not hear Kennedy use a racial slur in the recording. *Id.*

On December 22, 2020, Kennedy received a no-contact order, prohibiting Kennedy from having any contact with Redman. *Id.* at ¶ 50. Redman did not receive a no-contact order prohibiting her from having any contact with Kennedy. *Id.* at ¶ 51. Because the two could not be in contact, Kennedy's shift changed from the day shift to the evening shift. *Id.* at ¶ 50. The no-contact order remained in place even after the conclusion of DeCA's investigation on or about February 26, 2021, and continued until October 14, 2022. *Id.* at ¶¶ 53, 73.

Kennedy alleges her direct supervisor, Dunk, after conferring with human resources regarding a range of potential disciplinary actions, proposed a 7-day suspension to Pennington. *Id.* at ¶¶ 55-57. Pennington thereafter issued a Notice of Proposed Suspension on February 26, 2021, calling for a 7-day suspension, specifying as bases for the proposed action that Kennedy had called Redman a racial epithet on December 16, 2020, had subjected Redman to race-based harassment, and violated DeCA policy by surreptitiously recording her interaction with Redman. *Id.* at ¶¶ 58-

59. Rountree, who by then had replaced Pennington, upheld the proposed action on all proposed grounds supporting the suspension on June 2, 2021.[1] *Id.* at ¶ 67. Kennedy alleges that Redman did not receive any corrective action or discipline in contrast. *Id.* at ¶¶ 60, 76.

## STANDARD OF REVIEW

On a motion to dismiss for failure to state a claim under Rule 12(b)(6), a plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted). To that end, courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986). Rather, the court considers whether a complaint asserts "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). A plausible claim for relief must include "factual content [that] allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. Where the facts allow an inference of only the mere possibility of misconduct, they are insufficient to support a plausible claim. *Id.* at 679. "Stated differently, the factual allegations in the complaint must possess enough heft to set forth a plausible entitlement to relief." *Edwards v. Prime, Inc.*, 602 F.3d 1276, 1291 (11th Cir. 2010)

---

[1] Kennedy notes that the suspension itself is the subject of a separate EEO complaint that is proceeding separately through the administrative process. *Id.* at ¶¶ 69, 71-72. As a consequence, Kennedy does not challenge through the instant suit the suspension itself or claim any damages stemming from it. *Id.* at ¶ 72 n.3.

7

(internal punctuation and citations omitted).

## ARGUMENT

**I.     The Proposal of a Suspension Is Not an Actionable Adverse Employment Action.**

A plaintiff must plead an actionable adverse action for her discrimination claim to be plausible and survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6). *See McCone v. Pitney Bowes, Inc.*, 582 F. App'x 798, 801 (11th Cir. 2014); *Chapman v. U.S. Postal Serv.*, 442 F. App'x 480, 484 (11th Cir. 2011). "It has long been settled that Title VII makes discriminatory treatment actionable only if it reaches a sufficient level of substantiality." *Monaghan v. Worldpay US, Inc.*, 955 F.3d 855, 860 (11th Cir. 2020). "Not all employer actions that negatively impact an employee qualify as adverse employment actions." *Howard v. Walgreen Co.*, 605 F.3d 1239, 1245 (11th Cir. 2010). An adverse employment action under Title VII is one constituting a serious and material change in the terms, conditions, or privileges of employment. *Crawford v. Carroll*, 529 F.3d 961, 970-71 (11th Cir. 2008). This standard is an objective one. *Palmer v. McDonald*, 624 F. App'x 699, 701-02 (11th Cir. 2015). Most commonly, actionable adverse actions consist of "hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *McCone*, 582 F. App'x at 800.

The Third Amended Complaint appears to base Kennedy's disparate treatment claim on three adverse employment actions: (1) her supervisors' proposal to suspend Kennedy, as distinguished from the suspension itself; (2) the imposition of a no-contact order prohibiting Kennedy from interacting with Redman; and (3) changing

Kennedy's shift.

The first of these is not actionable as an adverse employment action. Kennedy's Third Amended Complaint alleges DeCA notified Kennedy it intended to suspend her for 7 days for several reasons, including Kennedy's harassment of Redman and calling Redman a racial slur, as well as Kennedy's violation of agency policy by unilaterally using a recording device in the workplace without consent. See Doc. 45 at ¶¶ 55-59. Kennedy does not rely on the suspension itself as an adverse employment action for purposes of this lawsuit. *See id.* at ¶ 72 n.3. Rather, as the complaint notes, DeCA's subsequent decision to move forward with the 7-day suspension is the subject of a separate EEO Complaint that is not before the Court. *See id.* at ¶¶ 69, 71, 72 & n.3.

Kennedy alleges that, by proposing that she be suspended, the agency "[r]atif[ied] and further[ed]" Redman's allegation that Kennedy called Redman a racial epithet and harassed Redman on the basis of Redman's race. *Id.* at ¶ 77(1). That supervisors credited Redman's claim that Kennedy called Redman a racial slur over Kennedy's denial and contrary evidence, in and of itself, changed nothing in the terms, conditions, and privileges of Kennedy's employment, much less to a serious and material degree. The Eleventh Circuit only recently affirmed dismissal pursuant to Fed. R. Civ. P. 12(b)(6) of a discrimination claim brought by a plaintiff "subjected to formal discipline including being threatened with a write up, a letter of counseling, and verbal counseling, as well as having been unfairly subjected to formal investigations." *Henderson v. City of Birmingham*, 826 F. App'x 736, 741 (11th Cir. 2020) (cleaned up). But without other "negative job consequences" that alter "the

9

terms, conditions, or privileges of [the plaintiff's] employment," internal investigations, employee discipline, and counseling are not themselves adverse employment actions that can support disparate treatment and discrimination claims. *Id. See also Davis v. Delta Airlines*, No. 1:20-CV-324, 2021 WL 2516226, at *4 (N.D. Ga. Jan. 4, 2021) (no plausible discrimination claim where the complaint alleged only that the plaintiff was "called into the director's office and reprimanded"), *adopted by*, 2021 WL 2517374 (N.D. Ga. Jan. 22, 2021). For that reason, the mere recommendation or proposal that a suspension occur is not itself adverse employment action needed to sustain a Title VII claim. *See Fortner v. DeJoy*, No. 2:19-CV-1409, 2022 WL 4591647, at *15-16 (N.D. Ala. Sept. 29, 2022) (citing cases).

The Court therefore should dismiss Kennedy's disparate treatment claim premised on her supervisors' proposal to suspend her.

## II. Kennedy Fails to Point to a Similarly Situated Comparator, Nor Any Other Basis to Infer Causation for Her Discrimination Claim.

To support a discrimination or disparate treatment claim, a plaintiff must present sufficient factual content in a complaint for the Court to plausibly infer causation between the plaintiff's status and adverse employment action. *Uppal v. Hosp. Corp. of Am.*, 482 F. App'x 394, 396 (11th Cir. 2012). "And even though the plaintiff is not required to allege a *prima facie* case at the motion to dismiss stage, alleging a comparator outside the plaintiff's class is a common thread among those discrimination claims that survive a motion to dismiss." *Jaffe v. Birmingham Reg'l Gastroenterology Assoc., PC*, No. 2:20-CV-1821, 2021 WL 4220356, at *3 (N.D. Ala. Sept. 16, 2021) (reviewing case law). *See also Henderson v. City of Birmingham*, No.

10

2:18-CV-2062, 2020 WL 230977, at *5 (N.D. Ala. Jan. 15, 2020) (without comparator, no plausible basis for race discrimination claim), *aff'd*, 826 F. App'x 736 (11th Cir. 2020). If the complaint's allegations show the would-be comparator is not "similarly situated in all material respects," the complaint must plausibly show a different means for the Court to infer causation. *Gilliam v. United States Dep't of Veterans Affairs*, 822 F. App'x 985, 991 (11th Cir. 2020) (quoting *Lewis v. City of Union City*, 918 F.3d 1213, 1228 (11th Cir. 2019) (en banc)).

"Treating *different* cases differently is not discriminatory, let alone intentionally so." *Lewis*, 918 F.3d at 1222-23. Material differences for purposes of assessing whether a comparator is similarly situated in all material respects include: (1) the comparative remedial action was taken by different supervisors, (2) the plaintiff and proposed comparator held different positions, and (3) the plaintiff and proposed comparator engaged in different misconduct. *Id.* at 1227-28; *Gilliam*, 822 F. App'x at 991. In other words, the plaintiff and comparator "must be sufficiently similar, in an objective sense, that they cannot reasonably be distinguished." *Lewis*, 918 F.3d at 1228. The Court is under no obligation at the motion to dismiss stage to blindly accept a plaintiff's legal conclusion that someone is a valid comparator. *See Arafat v. Sch. Bd. of Broward Cty.*, 549 F. App'x 872, 874 (11th Cir. 2013) (affirming dismissal of discrimination claims because the plaintiff's "generic reference" to purported comparators was too "tenuous and conclusory" (cleaned up)); *Maziar v. City of Atlanta*, No. 1:21-CV-2172, 2022 WL 4596340, at *3 (N.D. Ga. Sept. 29, 2022); *Drisin v. Fla. Int'l Univ. Bd. of Trustees*, No. 1:16-CV-24939, 2017 WL 3505299, at

*12 (S.D. Fla. June 27, 2017). Indeed, multiple decisions from within this Circuit have granted motions to dismiss where the factual allegations in a complaint insufficiently alleged a valid comparator. *See, e.g.*, *Gilliam*, 822 F. App'x at 990-91; *Arafat v. Sch. Bd. of Broward Cty.*, 549 F. App'x 872, 874 (11th Cir. 2013); *Maziar v. City of Atlanta*, No. 1:21-CV-2172, 2022 WL 4596340, at *3 (N.D. Ga. Sept. 29, 2022); *Walton v. Georgia Dep't of Comty. Affairs*, No. 1:21-CV-4164, 2022 WL 3337406, at *3 (N.D. Ga. Jul. 6, 2022); *Pittman v. Sunland Ctr., Fla. Agc'y for Persons with Disabilities*, No. 5:19-CV-1, 2019 WL 13140743, at *4 (N.D. Fla. Oct. 4, 2019); *Bell v. Johnson*, No. 3:15-CV-693, 2016 WL 8221939, at *5 (M.D. Fla. Sept. 14, 2016); *Jennings v. City of Tuscaloosa*, No. 7:13-CV-874, 2013 WL 5299304, at *4 (N.D. Ala. Sept. 19, 2013).

Kennedy's Third Amended Complaint might be construed to suggest two potential comparators, though neither is similarly situated in all material respects. Kennedy first suggests a cashier named Roshonda Davis is a valid comparator because Kennedy overheard Davis use a different iteration of the racial slur during a conversation with other coworkers in the front area of the store in October 2019. Doc. 45 at ¶ 15. Kennedy subsequently met with Davis; Wade Broomfield, the Deputy Store Manager; and Hope Joseph, the front-end manager. *Id.* at ¶ 17. Davis denied using the word and no other investigation was conducted to Kennedy's knowledge. *Id.* at ¶¶ 17-18.

Davis is not similarly situated to Kennedy for several reasons. Davis performed a different job (cashier) than Kennedy did at the time of the December 16, 2020 incident (store worker). *Id.* at ¶¶ 6, 15. Davis reported to different supervisors

12

(Joseph and Broomfield) than those allegedly involved in the decision to investigate Kennedy's use of the racial slur (Dunk, Pennington, and Murray) and uphold the proposed suspension of Kennedy (Rountree). *See id.* at ¶¶ 16-17, 46-49.[2] In fact, none of the decisionmakers allegedly involved in the challenged actions against Kennedy were present for the meeting with Davis. In addition, the alleged misconduct was materially different. Kennedy, by her own admission, violated agency policy by surreptitiously recording another employee at work. Davis did not. Further, Davis allegedly used a materially different iteration of the racial slur than Kennedy, *compare id.* at ¶ 15, *with* ¶¶ 46, 59, and, unlike Kennedy, allegedly used the term during conversation rather than calling a coworker a racial epithet. The Third Amended Complaint thus does not plausibly allege Davis is similarly situated in all material respects to Kennedy.

Nor is Redman a valid comparator. Although the Third Amended Complaint alleges that Redman used the same racial epithet "on multiple occasions" as Kennedy was alleged to have used, *id.* at ¶ 22, Kennedy does not allege that supervisors were ever made aware of Redman's use of the term so that they could take any corrective action.[3] Without such an allegation, Kennedy can only speculate how the agency

---

[2] Although Kennedy reported to Broomfield as a second-line supervisor both when she was a cashier and later as a store worker, her complaint makes clear that Broomfield "was a witness rather than a participant" who "had no input in the decision to suspend Kennedy." *Id.* at ¶ 9 n.1. The Third Amended Complaint further alleges it was Murray who directed gathering written statements from anyone involved in the December 16, 2020 incident between Kennedy and Redman. *Id.* at ¶ 46. Murray evidently played no role in determining a course of action in responding to Kennedy's complaint regarding Davis.

[3] Strictly speaking, the complaint does allege that Redman used the racial slur as

13

might have responded to Redman's use of the term. *See Vess v. MTD Consumer Group, Inc.*, 755 F. App'x 404, 408 (5th Cir. 2019) (white employee who was terminated after using racial slur was not similarly situated to black employees alleged to have used the same racial slur because their alleged usage never was reported).

And none of the conduct by Redman that Kennedy did report to supervisors is materially similar to Kennedy's alleged misconduct. On July 16, 2020, Kennedy allegedly reported that Redman cursed at Kennedy, and, during the meeting, Redman mentioned she could have slapped Kennedy and accused Kennedy of being racist. Doc. 45 at ¶ 26. Kennedy additionally claims to have complained about Redman to Dunk "three or four times between July 16, 2020, and August 18, 2020." *Id.* at ¶ 33. Although Kennedy does not disclose the nature of her complaints to Dunk, during that period, Kennedy claims Redman adopted physically intimidating postures toward Kennedy, blocked Kennedy's path, commented that Kennedy was "milking" a back injury by riding a motorized scooter, and complained regarding Kennedy's work performance. *Id.* at ¶¶ 28-31. None of the conduct Kennedy attributes to Redman is sufficiently similar to calling a coworker a racial epithet and recording a coworker without their consent.

---

part of objecting to and subsequently reporting Kennedy's offensive language. Doc. 45 at ¶¶ 41, 45. Defendant does not read the complaint to suggest that Redman should have been disciplined simply for reporting the term Kennedy allegedly used toward Redman. Even if the complaint could be construed in this fashion, though, there is certainly a material difference between calling a coworker a racial epithet and objecting to or reporting its use to one's supervisors.

Only one party was accused of calling someone a racial epithet: Kennedy. DeCA could not have punished Redman for using a racial slur against Kennedy due to the simple fact that Kennedy never accused Redman of doing so. Moreover, Kennedy's generalized claim that Redman was harassing her had no nexus to Kennedy's race. So, faced with an accusation that Kennedy had engaged in race-based harassment prohibited by Title VII, versus Kennedy's allegation that Redman was allegedly engaged in race-neutral harassment afforded no such protection, DeCA was not required to treat Kennedy and Redman the same. *See Crumpler v. Verizon Wireless*, No. 1:15-CV-160, 2017 WL 779937, at *3 (S.D. Ga. Feb. 28, 2017) (distinguishing proposed comparator who "was accused of making inappropriate comments, false allegations, and character attacks" because that conduct was different than being "accused of making racially discriminatory remarks"). Nor has Kennedy come forward with any authority that Title VII protects an employee from wrongful accusations of using a racial slur toward someone else.[4] *Contra, e.g.*, *Phillips v.*

---

[4] Moreover, Kennedy's argument that DeCA discriminated against her because its actions "were based on demonstrably false accusations," Doc. 40 at 2, goes beyond what may plausibly be inferred from the facts contained in the Third Amended Complaint. The Court is required to accept Kennedy's well-pleaded facts as true in resolving a Rule 12(b)(6) motion, but it is not obligated to accept Kennedy's conclusions. Kennedy suggests the agency was required to exonerate Kennedy from Redman's accusation based on a partial recording made by Kennedy in violation of agency policy. The recording, as transcribed by Kennedy, allegedly documents a few moments of Kennedy's interaction with Redman in which Redman accuses Kennedy of having called Redman a racial slur. Yet it is clear from Kennedy's pleading that the recording captured only one part of a much longer interaction with Redman. Doc. 45 at ¶¶ 37-41. Other parts went unrecorded. Even accepting Kennedy's transcription as accurate, Kennedy's supervisors were not required to exclude the possibility that the racial epithet was uttered before the recording began.

15

*Starbucks Corp.*, 624 F. Supp. 3d 530, 547-48 (D.N.J. 2022) ("allegations that an adverse action was taken against an employee because he was falsely accused of being 'racist,' rather than because of the employee's own race, do not suffice to constitute 'race discrimination.'"); *Ledda v. St. John Neumann Regional Academy*, No. 20-CV-700, 2021 WL 1035106 at *5 (M.D. Pa. 2021) ("an accusation of racism, however wrong, does not fall within the protections of Title VII"); *Squitieri v. Piedmont Airlines, Inc.*, No. 3:17-CV-441, 2018 WL 934829, at *3 (W.D.N.C. Feb. 16, 2018) ("stating that Plaintiff is 'racist' is not racial on its face and is not related to Plaintiff's race").

What is more, only one of the two parties to the dispute conceded violating agency policy: Kennedy, who admittedly contravened agency policy by recording a coworker without consent. Redman, in contrast, engaged in no similar conduct nor admitted to violating any agency rules. "[T]he most important factors in a comparator analysis in the disciplinary context are the nature of the offenses committed and the nature of the punishments imposed." *Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1281 (11th Cir. 2008) (finding no comparator where, even though "the incidents certainly appear to be similar, the offenses… charged with were different"). Kennedy's admitted violation allowed DeCA to treat her differently than Redman, even if she subjectively believed the violation was not as serious. *See id.*; *Crumpler v. Verizon Wireless*, , 2017 WL 779937, at *3.

Without alleging a valid comparator, Kennedy offers no basis for the Court to draw a plausible inference of causation between Kennedy's race and the purported

16

adverse actions. All that remains are the allegations that Dunk, Pennington, and Rountree happen to be different races than Kennedy, and that Pennington once remarked, nine months prior to the December 16, 2020 incident, that Pennington did not "even like white guys" in describing Pennington's marriage to her Caucasian ex-husband. These bare allegations are not enough to allow Kennedy's discrimination and disparate treatment claim to proceed. *See Johnson v. City of New York*, 669 F. Supp. 2d 444, 450 (S.D.N.Y. 2009) ("The mere fact that plaintiff and defendants are of different races, standing alone, is simply insufficient as a factual pleading to allege racially motivated discrimination for purposes of a plausible section 1981 claim.").

The Court should dismiss Kennedy's disparate treatment claims because she has failed to plausibly allege a causal link between her race and the adverse employment actions.

### III. The Court Should Dismiss Any Claim under 42 U.S.C. § 1981 It Might Construe the Third Amended Complaint to Allege.

In determining that Kennedy's Second Amended Complaint was an impermissible shotgun pleading, the Court pointed out certain language in which Kennedy claimed DeCA "deprived . . . Plaintiff of her rights, under federal law and the United States Constitution, to equal protection under the law . . .", which the Court noted may implicate a claim under 42 U.S.C. § 1981. *See* Doc. 43 at 15 (quoting Doc. 32 at ¶ 1). Kennedy's Third Amended Complaint uses that same language, *see* Doc. 45 at ¶ 1, suggesting that Kennedy may wish to pursue a § 1981 claim even though it is not an enumerated as one of the counts. However, as the Court previously noted, Title VII provides a federal employee's exclusive remedy to recover for

discrimination and § 1981 does not apply to the federal government. *Brown v. GSA*, 425 U.S. 820, 834 (1976); *Lee v. Hughes*, 145 F.3d 1272, 1277 (11th Cir. 1998).

Although the Third Amended Complaint is ambiguous regarding Kennedy's intent to raise such a claim, the Court should dismiss any § 1981 claim it construes the Third Amended Complaint to raise.

## CONCLUSION

The Court should dismiss this case pursuant to Fed. R. Civ. P. 12(b)(6).

Dated: July 7, 2023

JILL E. STEINBERG
UNITED STATES ATTORNEY

/s/ Bradford C. Patrick
Assistant United States Attorney
South Carolina Bar No. 102092
Post Office Box 8970
Savannah, Georgia 31412
(912) 652-4422
Email: Bradford.Patrick@usdoj.gov