UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

| | |
|---|---|
| JAMIE KENNEDY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 4:21-CV-333 |
| ) | |
| LLOYD J. AUSTIN III, ) | |
| ) | |
| Defendant. ) | |

**REPLY TO PLAINTIFF'S RESPONSE IN OPPOSITION TO
DEFENDANT'S MOTION TO DISMISS
THE THIRD AMENDED COMPLAINT**

The central thesis of plaintiff Jamie Kennedy's case is that Title VII protects an employee not only from racial discrimination, but also from being *accused of engaging* in racial discrimination. It doesn't, and Kennedy's opposition identifies no authority for that proposition. Whatever remedies an employee has for being subjected to false allegations of racism, they do not lie under Title VII. The Court therefore should dismiss this case.

**I.   The Court Should Dismiss Certain Claims as Conceded.**

As an initial matter, Kennedy does not oppose dismissal of her disparate treatment claim premised on her supervisors' proposal to suspend her. As defendant argued, the mere proposal of a suspension is not actionable under Title VII because it does not constitute an adverse employment action. Kennedy concedes this argument by not opposing. *See* LCvR 7.5. Similarly, Kennedy expressly disclaims an

intent to sue under 42 U.S.C. § 1981, Doc. 51 at 8, so any such claim that might be read into the Third Amended Complaint should be dismissed.

## II. Kennedy Fails to Plausibly Allege That Any Adverse Action Occurred Because She Is Caucasian.

Kennedy appears to recognize the uncontradicted line of cases holding that "'[r]acism' is not a race, and discrimination on the basis of alleged racism is not the same as discrimination on the basis of race." *Maraschiello v. City of Buffalo Police Dep't*, 709 F.3d 87, 97 (2d Cir. 2013); *accord Cooper v. Franklin Templeton Investments*, No. 22-CV-2763, 2023 WL 3882977, at *3 (2d Cir. Jun. 8, 2023); *see also, e.g.*, *Lovelace v. Wash. Univ. Sch. of Med.*, 931 F.3d 698, 708 (8th Cir. 2019) (interpreting Missouri Human Rights Act) ("While 'falsely accusing someone of being a racist is morally wrong,' such accusations cannot form the basis of [a] racial discrimination claim."); *Sasser v. Ala. Dep't of Corr.*, 373 F. Supp. 2d 1276, 1289 (M.D. Ala. 2005) ("[T]he comments and actions of the African-American employees were not … related to Plaintiff's race at all, but alternatively were related to their perception of Plaintiff's attitude towards African-Americans."). She seeks to distinguish these cases because the attributions of racism or racist language may not have involved the use of the specific racial slur Kennedy allegedly used. *See* Doc. 51 at 7.

Kennedy argues that accusations that a Caucasian has used racial slurs amount to discrimination on the basis of the speaker's race on the theory that such epithets are "uniquely offensive coming from a Caucasian." *Id.* at 6-7. Therefore, she posits, taking an adverse employment action against a Caucasian falsely accused of

using racist language violates Title VII, presumably as direct discrimination.[1] Nearly the same argument was rejected in *Bank v. Community College of Philadelphia*, No. 22-CV-293, 2022 WL 2905243, at *5 (E.D. Pa. Jul. 22, 2022). The plaintiff there claimed he was falsely alleged to have engaged in various microaggressions and macroaggressions at the college where he served as a tenured professor. He argued the conduct he was alleged to have engaged in could only be "offensive and racist because Professor Bank is white." *Id.* The court disclaimed that illogic, finding that "to hold that Title VII shields employees from being perceived as racist or from being accused of racist conduct would 'turn Title VII on its head' and impede employers in the critical work of combatting racism in the workplace." *Id.*

In the related, albeit different context of sex discrimination, courts frequently have dismissed claims of disparate treatment brought by individuals claiming to have been falsely accused of sexual harassment. *See, e.g.*, *Balazs v. Liebenthal*, 32 F.3d 151, 155 (4th Cir. 1994) ("An allegation that [plaintiff] was falsely accused of conduct which, if true, might have given rise to a claim of employment discrimination based on sex by someone else in no way states a cause of action that plaintiff himself was a

---

[1] Kennedy does not explain why her formulation of the law, if accepted, depends on the truthfulness or falsity of the accusation. Rather, if Kennedy were correct that Title VII protects Caucasians from *false* allegations of using racial slurs because they are allegedly "uniquely offensive" when spoken by Caucasians, Doc. 51 at 6, it seemingly would prevent employers from taking adverse action against Caucasians who admit using them as well. Crediting Kennedy's argument, in either situation the utterance of the racial slur allegedly would have "unique" power due to the race of the speaker. Needless to say, that result is incompatible with how courts have interpreted Title VII. *See Vess v. MTD Consumer Group, Inc.*, 755 F. App'x 404, 409 (5th Cir. 2019) (employer had legitimate, non-discriminatory reasons for terminating Caucasian employee for using racial slurs).

victim of discrimination based on his sex."); *Albert v. Edward J. DeBartolo Corp.*, 999 F.2d 539, at *3 (6th Cir. 1993) (table decision) ("Plaintiff's true complaint is that he was wrongfully discharged because of false accusations of sexual harassment, a claim that is not cognizable under Title VII."); *Rochefort v. Global Precision Servs.*, No. 20-CV-298, 2021 WL 3566419, at *3 (W.D. Tex. Apr. 14, 2021) ("Title VII does not provide a cause of action for false accusations of sexual harassment. It is a required element that a plaintiff be subjected to the alleged sexual harassment himself."). Citing this line of cases, one court has found that "[a]n employer may, without running afoul of Title VII, discharge an employee who has been charged by another employee with racist or sexist conduct." *Burke v. Sears-Roebuck Co.*, No. 98-CV-4364, 1999 WL 358915, at *1 (E.D. Pa. June 2, 1999).

A similar result attains here. If Kennedy had called her coworker Ellistina Redman a racial slur, Redman may have been exposed to unlawful harassment based on race. But an individual is not a *victim* of racial harassment by engaging in racial harassment or being accused of doing so. A person's behavior is not an immutable characteristic like race. To hold otherwise would give employers an impossible choice when confronted with disputed allegations of racial harassment, exposing the employer to potential liability regardless of whether it takes action to separate the employees. *See Stancombe v. New Process Steel LP*, 652 F. App'x 729, 737 (11th Cir. 2016) (holding employer responded appropriately to plaintiff's complaint of harassment by ordering him to have no contact with harasser and moving them to different shifts). To the extent Kennedy raises a claim of direct discrimination when

4

her supervisors changed her shift and issued a no-contact order, it should be dismissed.

Nor does Kennedy's Third Amended Complaint plausibly allege a circumstantial basis to infer a discriminatory motive, either due to the existence of a similarly situated comparator who was treated differently or because of a convincing mosaic of discriminatory intent.

Kennedy alleges that Redman is a valid comparator[2] because during the December 16, 2020 incident, Redman "shout[ed], us[ed] profanity, hurl[ed] false accusations,[3] and engag[ed] in threats, yet she received no discipline in any form for her actions." Doc. 51 at 4. Kennedy claims that a recording proved she engaged in no similar conduct—a contention in obvious tension with the notion that Redman's conduct was comparable to hers, much less sufficiently similar in all material respects. *See Lewis v. City of Union City*, 918 F.3d 1213, 1228 (11th Cir. 2019) (en banc). Indeed, Kennedy was moved to a different shift and the subject of a no-contact

---

[2] Kennedy does not oppose defendant's argument that Roshonda Chavis is an invalid comparator.

[3] Kennedy takes issue with a fundamental limitation of all recordings. *See* Doc. 51 at 2 n.1. While no doubt useful to memorialize what occurs while activated, they cannot capture what comes before. Defendant points out what should be self-evident: assuming Kennedy has accurately transcribed the recording she played for her supervisors, the recording captured only what it captured. Indeed, Kennedy recounts other statements during the interaction with Redman that apparently went unrecorded. *See* Doc. 45 at ¶ 37 (describing how Redman demanded "Key Nineteen" in an "overly aggressive tone"). Because Kennedy's supervisors had no opportunity to review the entire interaction, they were not required to dismiss Redman's claim that Kennedy called her a racial epithet. Regardless, even if one assumes that Kennedy's supervisors disciplined Kennedy with actual knowledge that Redman's accusation was false, Kennedy still has failed to plead facts leading to a plausible inference that the "real reason" for the adverse action was Kennedy's race.

5

order, not because Kennedy shouted, used profanity, levied false accusations, or made threats, but because Kennedy allegedly called Redman a racial slur and because Kennedy violated agency policy by surreptitiously recording the interaction. These are not, as Kennedy argues, differences "in the most technical sense." Doc. 51 at 3. None of the conduct Kennedy attributes to Redman is the functional equivalent of calling a co-worker a racial slur, as this Court has recognized. *See Crumpler v. Verizon Wireless*, No. 1:15-CV-160, 2017 WL 779937, at *3 (S.D. Ga. Feb. 28, 2017) (distinguishing proposed comparator who "was accused of making inappropriate comments, false allegations, and character attacks" because that conduct was different than being "accused of making racially discriminatory remarks"). For this reason, Kennedy's analysis regarding who was the supposed "aggressor," Doc. 51 at 3-4, misses the mark. As defendant previously pointed out, DeCA could not discipline Redman for using racial slurs or engaging in racial harassment because Kennedy never accused Redman of doing so. Nor is there any indication Redman made a nonconsensual recording of Kennedy or any other co-worker. DeCA therefore had no opportunity to treat similarly situated employees disparately.

Alternatively, Kennedy argues she "can easily establish" causation through a convincing mosaic of circumstantial evidence of discrimination. Doc. 51 at 5. For support, she points to alleged comments by Redman and Pennington that Kennedy perceived as evidencing bias against Caucasians. For starters, the statements Kennedy attributes to Redman are not relevant in divining her supervisors' motivations. *See Steger v. General Elec. Co.*, 318 F.3d 1066, 1079 (11th Cir. 2003)

6

(statements of non-decisionmakers are not relevant evidence of discrimination). What remains is a single remark in April 2020 attributed to Pennington, allegedly of Filipina descent, that Pennington does not "like white guys" and married her Caucasian ex-husband to get out of the Philippines. Doc. 45 at ¶ 20. That lone comment regarding Pennington's romantic preferences, which preceded the alleged adverse action by approximately eight months, is far too attenuated to suggest that Pennington changed Kennedy's shift and ordered her to have no contact with Redman because of Kennedy's race. It does not come close to a plausible, much less a convincing mosaic of discriminatory intent toward Caucasians.

Next, Kennedy alleges that Pennington and Dunk's awareness of Redman's harassment of Kennedy for months prior to the December 16, 2020 incident suggests Pennington and Dunk harbored a discriminatory motive toward Kennedy because she is Caucasian. Doc. 51 at 5. A review of the Third Amended Complaint, however, provides no indication that Kennedy relayed any basis for Pennington and Dunk to have concluded Redman's alleged harassment had anything to do with Kennedy's race. In fact, Kennedy only attributes one remark to Redman bearing on Redman's alleged bias in the "spring of 2020," in which Redman expressed displeasure that Redman's son was marrying a white woman, allegedly stating she "would not allow him to stay overnight with white friends at their homes because she did not 'trust white people to treat him well.'" Doc. 45 at ¶ 21. Kennedy does not allege she ever alerted her supervisors of Redman's stray comment. This defect notwithstanding, and even if Redman's isolated statement could be construed as a remark upon Kennedy's

7

race, this comment, made in the "spring of 2020," is too remote and non-specific to plausibly suggest the alleged harassment that began months later, in July 2020, was based on Kennedy's membership in a protected group. *See Mensah v. Mnuchin*, No. 20-CV-22876, 2020 WL 6701926, at *14-15 (S.D. Fla. Nov. 13, 2020). To the contrary, Kennedy indicates several race-neutral bases for the animosity between Redman and Kennedy, including Kennedy's sharing of gossip, Doc. 45 at ¶ 23, Kennedy's alleged political preferences, *id.* at ¶ 26, and Kennedy's work performance, *id.* at ¶ 31. *Cf. Ashcroft v. Iqbal*, 556 U.S. 662, 682 (2008) (discrimination need not be inferred in the face of "obvious alternative explanations" suggesting lawful conduct). Kennedy "cannot make actionable ordinary workplace tribulations by turning a 'personal feud' between herself and a coworker into a Title VII … claim." *Alhallaq v. Radha Soami Trading, LLC*, 484 F. App'x 293, 296 (11th Cir. 2012). Thus, even crediting Kennedy's allegations, Redman's alleged race-neutral harassment does not add to any plausible convincing mosaic showing that Kennedy was treated differently due to her status as a Caucasian.[4]

Lastly, Kennedy claims that DeCA's response to her violation of agency policy forbidding nonconsensual recordings "is the very definition of pretext." Doc. 51 at 6. This is a purely conclusory statement based on Kennedy's subjective perception of the

---

[4] Kennedy also analyzes the allegedly disparate treatment of Redman and Kennedy in the December 16, 2020 incident as part of her convincing mosaic theory, Doc. 51 at 5, but that analysis is conceptually a question of whether the two are similarly situated comparators. Either way, the material differences between the alleged conduct attributed to Kennedy and Redman allowed DeCA to treat them differently without giving rise to an inference of disparate treatment.

infraction. *See Chapman v. AI Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000) (*en banc*) ("A plaintiff is not allowed to recast an employer's proffered nondiscriminatory reasons or substitute [her] business judgment for that of the employer."). Kennedy has not alleged that DeCA enforced the prohibition on making recordings in the workplace, itself a form of harassment, differently in similar cases. Kennedy has proffered no plausible basis for the inference that her race was the "real reason" for the alleged adverse actions. *See Brooks v. Cnty. Comm'n of Jefferson Cnty*, 446 F.3d 1160, 1163 (11th Cir. 2006).

## CONCLUSION

Kennedy now has had four opportunities to craft a complaint plausibly showing that DeCA took adverse action against her due to her status as a Caucasian, and three opportunities to oppose defendant's motions repeatedly pointing out the fundamental defects in her allegations. Kennedy appears to believe that simply because she was accused of using racist language, her own race must have motivated any resulting adverse action. That is not the law, and the Court should dismiss her case with prejudice.

Dated: August 3, 2023

JILL E. STEINBERG
UNITED STATES ATTORNEY

/s/ Bradford C. Patrick
Assistant United States Attorney
South Carolina Bar No. 102092
Post Office Box 8970
Savannah, Georgia 31412
(912) 652-4422
Email: Bradford.Patrick@usdoj.gov